## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | **CIVIL NO. _____** |
| v. | * | |
| | * | |
| **$504,854.69 SEIZED FROM AN M&T** | * | |
| **BANK ACCOUNT HELD IN THE** | * | |
| **NAME OF IDESIGNBUILD, LLC** | * | |
| | ****** | |
| **Defendant** | | |

## DECLARATION OF MATTHEW LACORTE

I, Matthew LaCorte, a Special Agent with the United States Secret Service, being duly sworn, depose and state:

### Introduction and Agent Background

1.      I am a duly appointed Special Agent with the United States Secret Service ("USSS") and have been employed as such since December 2015. Through my employment with the USSS, I have gained knowledge in the use of various investigative techniques including the utilization of physical surveillance, undercover agents, confidential informants and cooperating witnesses, consensually monitored recordings, investigative interviews, financial investigations, the service of administrative and grand jury subpoenas, mobile wireless tracking methods, analyzing telephone pen register and caller identification system data, and the execution of search and arrest warrants, including those executed upon physical addresses as well as those executed upon electronic equipment and data storage providers.

2.      Throughout my career in law enforcement, I have become familiar with the methods and techniques associated with financial institution fraud and counterfeit trends and tactics. In the course of my training and conducting financial investigations, I have incorporated

1

the use of the following investigative techniques: interviewing informants, cooperating witnesses, victims, and subjects; physical surveillance and utilization of various surveillance techniques; supporting undercover operations; participating in mobile wireless tracking missions; and preparing and executing search and arrest warrants that have led to seizures of counterfeit currency, access devices, and other instruments used to commit financial fraud.

3.        Based on my knowledge, training, and experience in the investigation of financial institution fraud, I am familiar with the ways in which fraudsters conduct their business. My familiarity includes the various means and methods by which individuals defraud financial institutions; their use of cellular telephones and social media accounts to facilitate fraud; and their use of code words to describe fraud. I am familiar with the ways that those who commit financial institution fraud are able to carry out their fraud without detection. Financial institution fraud is commonly an ongoing and recurring criminal activity. As contrasted with crimes against persons, which tend to be discrete offenses, crimes such as bank fraud and wire fraud are illicit commercial activities that are characterized by regular, repeated criminal activity.

4.        The information set forth below is based upon my review of records and upon information provided by other sworn law enforcement officers participating in this investigation. I have not included each and every fact obtained pursuant to this investigation, but I have set forth those facts that support my reasonable belief that the property is subject to forfeiture, and I have not omitted any facts or information available to me that would undermine that belief.

### Purpose of This Declaration

5.        This declaration is submitted in support of a civil judicial complaint for forfeiture *in rem* of $504,854.69 seized from M&T Bank Account Number ending in x3819, held in the name of iDesignbuild, LLC (the "TARGET ACCOUNT").

6.      I submit there are sufficient facts to support a reasonable belief that the $504,854.69 seized from the TARGET ACCOUNT constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1344, and thus is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

## Background

*The Paycheck Protection Program*

7.      The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law, enacted in March 2020, designed to provide emergency financial assistance to Americans who are suffering from the economic consequences of COVID-19.

8.      The CARES Act authorized up to $659 billion in forgivable loans to small businesses for employee retention and certain business expenses through a program called the Paycheck Protection Program ("PPP") in 2020.

9.      The program authorized qualifying small businesses and other organizations to receive loans that are 100 percent guaranteed by the Small Business Administration ("SBA"), and the full principal amount of the loans may qualify for loan forgiveness.  The business must use PPP loan proceeds on payroll costs, mortgage interest, rent, and utilities.  Initially, the program allowed the principal to be forgiven if the business spent the loan proceeds on qualifying expenses within eight weeks of loan issuance and used at least 75 percent of the loan for payroll.  On June 5, 2020, the Paycheck Protection Program Flexibility Act of 2020 went into effect.  This law extended the period from eight weeks to 24 weeks that the loan proceeds had to be spent and reduced the requirement that the loan proceeds be spent on payroll from 75 percent to 60 percent.

10.     In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which must be signed by an authorized representative of the business. The PPP loan application requires the business (through its authorized representative) to acknowledge the

program rules and make certain affirmative representations and certifications in order to be eligible to obtain the PPP loan. In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees. These figures are used to calculate the amount of money the small business is eligible to receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

11.    A PPP loan application must be processed by a participating financial institution ("the lender"). If a PPP loan application is approved, the participating financial institution funds the PPP loan using its own monies, which are 100% guaranteed by Small Business Administration ("SBA"). Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

12.    The business's number of employees and average monthly payroll costs for the 12-month period prior to the disaster determine the amount of PPP funding that the business may receive. Businesses applying for PPP loans must provide documentation showing their payroll expenses.

13.    The PPP is overseen by the SBA, which is headquartered at 409 3rd Street SW, Washington, DC 20416, and has authority over all loans. Individual PPP loans, however, are issued by private approved lenders (most commonly, banks and credit unions), who receive and process PPP applications and supporting documentation, and then make loans using the lenders' own funds.

14.    Common fraud indicators that are seen with PPP loans include:

    i. New Employer Identification Numbers ("EIN") on the loan applications;

    ii.  EINs of businesses not in good standing being used;

   iii.  Fake businesses established using stolen identities;

   iv.  Immediate overseas wire transfers of the loan funds;

   v.  Romance scams and social media solicitations that persuade people to provide personally identifiable information to "get free money." The information is then used to apply for SBA loans and portions of the proceeds go to the ringleader;

   vi.  False statements on loan applications;

   vii.  Fraudulent supporting documents provided to the lender or SBA (payroll forms, tax forms);

  viii.  Inflation of payroll; and

   ix.  Misuse of proceeds.

15.    The above fraud indicators are derived from the lender/SBA's rules of eligibility. The eligibility criteria are stated on the SBA application. If an account is flagged as fraudulent by a financial institution due to one of the above fraud indicators, the case is referred to law enforcement to further assess eligibility.

### iDesignBuild LLC's PPP Loans

16.    iDesignbuild, LLC (the "Subject Business") is a construction company formed in Maryland on January 29, 2016. According to the Maryland State Department of Assessment and Taxation, the Subject Business's corporate address is 14056 Fox Hill Road, Sparks Glencoe, Maryland.

17.    The resident agent for the Subject Business is Alexander Barabash ("BARABASH"). BARABASH has a listed address of 14056 Fox Hill Road, Sparks Glencoe, Maryland.

18.     An M&T Bank account ending in x3819 ("M&T x3819") in the name of the Subject Business was opened on February 24, 2016.  BARABASH is the sole signor on the account.

*April 2020 PPP Loan*

19.     On or about April 9, 2020, BARABASH submitted a PPP Borrower Application (SBA Form 2483) to M&T Bank.  Based on the representations that BARABASH made and caused to be made on the SBA Form 2483, and the supporting documents, the Subject Business received a PPP loan for $46,800.00 (the "**April 2020 PPP Loan**").  The loan application represented that the Subject Business had four employees and an average monthly payroll of $18,750. BARABASH signed the loan application with the listed title of CEO. On April 23, 2020, the **April 2020 PPP Loan** was funded by M&T Bank, and $46,800.00 was deposited into the Subject Bank Account.

*Second April 2020 PPP Loan Application and Denial*

20.     On or about April 23, 2020, just two weeks after submitting the application that resulted in the **April 2020 PPP Loan**, BARABASH submitted another PPP loan application for the Subject Business to M&T Bank, seeking a $96,944.00 PPP loan.[1]  BARABASH later provided an updated, corrected version of the PPP loan application, with handwritten corrections dated April 25, 2020.  The updated and corrected application represented that the Subject Business had seven employees and an average monthly payroll of $38,777.60—which was three additional employees, and $20,027.60 in additional average monthly payroll, compared to the application submitted just two weeks prior.

---

[1] The initial form dated April 23, 2020, requested $104,000.00 based on an average monthly payroll of $41,600.00 and eight employees.  A form with handwritten corrections that appear to be initialed "AB" dated April 25, 2020, amends the average monthly payroll to $38,777.60, the number of employees to seven, and the requested loan amount to $96,944.00.

21.     In support of the second loan application, BARABASH submitted to M&T Bank: 2019 IRS Forms 941, Employer's Quarterly Federal Tax Return, for every quarter that year, as a well as a 2019 IRS Form 940, Employer's Annual Federal Unemployment (FUTA) Tax Return. The IRS Form 940 reported $387,777.71 in total payments to all employees of the Subject Business, e-signed by BARABASH and dated January 26, 2020.  The IRS Forms 941 for the Subject Business, which were all e-signed by BARABASH, reported the following:

     a.   Quarter 1: 7 employees and $96,077.63 in wages, tips and other compensation;

     b.   Quarter 2: 7 employees and $101,653.22 in wages, tips, and other compensation;

     c.   Quarter 3: 7 employees and $103,173.46 in wages, tips, and other compensation;

     d.   Quarter 4: 5 employees and $86,873.40 in wages, tips, and other compensation.

22.     Sometime between May and July 2020, and in connection with another transaction with M&T Bank, BARABASH submitted to M&T Bank a 2018 IRS Schedule C (IRS Form 1040) and a 2019 IRS Schedule C (IRS Form 1040) for the Subject Business.  The 2018 IRS Schedule C reported gross receipts of $751,443.00 and net losses of ($68,136.00) for the Subject Business in 2018.  The 2019 IRS Schedule C reported gross receipts of $1,253,250.00, and net profits of $150,913.00, for the Subject Business in 2019.

23.     M&T Bank denied the April 23, 2020 loan application.  Based on my training, knowledge and experience, I understand that the Paycheck Protection Program permits each applicant to only receive one First Draw PPP loan, which means that the Subject Business was ineligible to receive another loan after previously receiving the **April 2020 PPP Loan**.[2]

---

[2] *See* Paycheck Protection Program Loans: Frequently Asked Questions (FAQs), July 29, 2021 update, at 11 ("…individual business entities cannot apply for more than one First Draw or Second Draw PPP Loan."), *available at* https://www.sba.gov/sites/default/files/2021-07/FINAL%20FAQ%20Update%207.29.21-508.pdf.

*January 2021 PPP Loan*

24.     On January 20, 2021, BARABASH submitted a PPP Borrower Application (SBA Form 2483) to M&T Bank. Based on the representations that BARABASH made and caused to be made on the SBA Form 2483, and the supporting documents, the Subject Business received a PPP loan for $1,295,000.00 (the "**January 2021 PPP Loan**"). The application submitted in support of the **January 2021 PPP Loan** represented that the Subject Business had 37 employees – more than nine times the number of employees BARABASH purported to have approximately nine months prior, on his **April 2020 PPP Loan** application. The **January 2021 PPP Loan** application also stated that the Subject Business had an average monthly payroll of $525,227.00 and requested a loan amount of $1,313,067.00. On February 26, 2021, M&T Bank funded the **January 2021 PPP Loan**, depositing $1,295,000.00 into the Subject Bank Account.

25.     In support of the **January 2021 PPP Loan** application, BARABASH provided to M&T Bank a 2019 IRS Forms 941 for the Subject Business and a 2019 Schedule C (IRS Form 1040) for BARABASH. The 2019 IRS Forms 941 for the Subject Business were initialed at the bottom and dated February 3, 2021, and reported the following:

  a.  Quarter 1: 45 employees and $1,575,689.44 in wages, tips and other compensation;

  b.  Quarter 2: 45 employees and $1,575,689.44 in wages, tips, and other compensation;

  c.  Quarter 3: 45 employees and $1,575,689.44 in wages, tips, and other compensation;

  d.  Quarter 4: 45 employees and $1,575,689.44 in wages, tips, and other compensation.

26.     The 2019 IRS Forms 941 should have been identical to the ones BARABASH provided for the second **April 2020 PPP Loan**. However, the second set of 2019 Forms 941 reported more than six times the number of employees and nearly $1.5 million more in wages paid each quarter by the Subject Business.

27.     BARABASH also provided a 2020 IRS Form 940 and 2020 IRS Forms 941 in support of the January 2021 PPP Loan application.  The 2020 IRS Form 940 reported $4,727,038.32 in total payments made to all employees and was signed by BARABASH and dated January 15, 2021.  The 2020 IRS Forms 941 for the Subject Business reported the figures below. Strangely, when compared to the 2019 IRS Forms 941, the Subject Business reported eight fewer employees, but exactly $10.00 less in wages, tips and other compensation paid in each quarter:

   a.   Quarter 1: 37 employees and $1,575,679.44 in wages, tips and other compensation;

   b.   Quarter 2: 37 employees and $1,575,679.44 in wages, tips, and other compensation;

   c.   Quarter 3: 37 employees and $1,575,679.44 in wages, tips, and other compensation;

   d.   Quarter 4: 37 employees and $1,575,679.44 in wages, tips, and other compensation.

28.     Review of all three PPP loan applications and supporting documents shows that BARABASH made inconsistent representations about the payroll for the Subject Business in each of the three PPP loan applications that he submitted in the nine-month period from April 2020 to January 2021.  The chart below summarizes the discrepancies in the representations made to M&T Bank in connection with the three applications.

| Transaction | April 2020 PPP Loan | Unsuccessful April 2020 PPP Loan App. | January 2021 PPP Loan |
|---|---|---|---|
| Date | April 9, 2020 | April 25, 2020 | January 20, 2021 |
| PPP Borrower Application Form | 4 employees; $18,750.00 | 7 employees; $38,777.60 | 37 employees; $525,277.00 |
| 2019 IRS Form 941 – Q1 | N/A | 7 employees; $96,077.63 | 45 employees; $1,575,689.44 |
| 2019 IRS Form 941 – Q2 | N/A | 7 employees; $101,653.22 | 45 employees; $1,575,689.44 |
| 2019 IRS Form 941 – Q3 | N/A | 7 employees; $103,173.46 | 45 employees; $1,575,689.44 |
| 2019 IRS Form 941 – Q4 | N/A | 5 employees; $86,873.40 | 45 employees; $1,575,689.44 |

*Other Representations Made by BARABASH to M&T Bank and to the IRS*

29.    As stated above, in connection with another transaction with M&T Bank between May 2020 and July 2020, BARABASH submitted a 2019 IRS Form 1040 showing a gross income of $1,253,250.00, and a 2018 IRS Form 1040 showing a gross income of $751,443.00.  These figures do not match what the IRS had on file for BARABASH at the time.

30.    In July 2020, M&T Bank obtained tax return transcripts directly from the IRS with written authorization from BARABASH.  The tax transcripts from the IRS showed that, on his 2019 IRS Form 1040, Schedule C, BARABASH reported a gross business income of $3,250.00.[3] On BARABASH's 2018 IRS Form 1040, Schedule C, BARABASH reported $0.00 in gross business income.

31.    In January 2022, investigators obtained records of BARABASH's tax filings directly from the IRS.  According to the records, none of the Forms 940 or 941 that BARABASH provided to M&T Bank on behalf of the Subject Business were on file with the IRS.  Based on this information, it appears that the Forms 940 and 941 provided by BARABASH to M&T Bank in support of the Subject Business PPP loan applications were fabricated.

32.    Records obtained from the IRS showed that on November 1, 2021, BARABASH filed an IRS Form 1040-X, Amended U.S. Individual Income Tax Return for the tax year 2019. The 2019 IRS Form 1040-X. which was prepared by Douglas Davis of Beers Tax and Accounting in Essex, Maryland, contained an amended Schedule C for the Subject Business.  The amended Schedule C reported vastly different figures compared to the Schedule C from BARABASH's original 2019 filing.  For example, BARABASH's amended Schedule C declared $1,250,693.00

---

[3] On November 1, 2021, BARABASH had an amended 2019 IRS Form 1040-X prepared and filed on his behalf, as discussed in paragraph 31 below.

in gross receipts or sales for the Subject Business, a staggering increase over the $3,250.00 BARABASH declared in the original 2019 Schedule C.

33.     As required by all three PPP loan applications submitted to M&T Bank and the SBA, BARABASH affirmed, by initial and signature, that the information provided on "this application and the information provided in all supporting documents and forms is true and accurate in all material respects."

34.     Based upon the foregoing, I believe that BARABASH knowingly made fraudulent representations about gross income and payroll for the Subject Business during the PPP application process.

### BARABASH's Spending of PPP Loan Proceeds

35.     PPP loan proceeds must be used by the recipients on certain permissible expenses such as payroll costs, interest on mortgages, rent, and utilities.  BARABASH certified on his PPP loan applications that the loan proceeds would only be used for these eligible purposes.  However, according to M&T Bank records, on or about March 26, 2021—just one month after the proceeds from the **January 2021 PPP Loan** were disbursed into the M&T Bank account bearing the name of the Subject Business—BARABASH purchased a 2016 Chevrolet Corvette from Southeast Auto Showroom in Pompano Beach, Florida.  Funds from the PPP loan funded this purchase, at least in part.  Checks were drawn from the M&T x3819 account, and a line of credit at M&T Bank in the name of the Subject Business, to purchase the vehicle.  Then, BARABASH used funds in the M&T x3819 account to make payments toward the line of credit balance.  Thus, the purchase of the 2016 Chevrolet Corvette was an ineligible use of PPP loan funds.

## CONCLUSION

36.     Based on the foregoing, I submit that there is probable cause to believe that the $504,854.69 seized from M&T Bank account x3819 constitutes or is derived from proceeds traceable to violations of 18 U.S.C. § 1344, and it is forfeitable to the United States under 18 U.S.C. § 981(a)(1)(C).


I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 21st day of April, 2022.

_Matthew LaCorte_
Matthew LaCorte
Special Agent
United States Secret Service